IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Danita L. Sumter, | ) | C/A No. 3:11-3485-JFA-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Blue Cross Blue Shield of SC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The plaintiff, Danita L. Sumter ("Sumter"), filed this employment case alleging claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., as well as state law claims of defamation and violation of the South Carolina Payment of Wages Act, S.C. Code Ann. § 41-10-10, et seq., against her former employer, Blue Cross Blue Shield of South Carolina ("BCBS"). This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendant's motion for summary judgment. (ECF No. 57.) Sumter filed a response in opposition (ECF No. 63) and the defendant replied (ECF Nos. 69 & 70). Having reviewed the parties' submissions and the applicable law, the court finds that the defendant's motion for summary judgment should be granted.

## BACKGROUND

The following facts are either undisputed or are viewed in the light most favorable Sumter, to the extent they find support in the record. Sumter is an African-American female who began working for the defendant on February 2, 1998. Sumter started working from home in 2000 as an off-site claims analyst and was compensated based on the number of claims processed ("piece-rate

employee"). BCBS also had in-house claims analysts who were paid an hourly salary. Sumter did not receive employee benefits as an off-site analyst but had the potential to make a higher salary than an in-house employee. As a piece-rate employee, Sumter was required to input the number of hours and claims she worked into a computer system called "My E-Time," which BCBS used to generate her pay. BCBS also used a computer system known as "AMOS" to monitor the productivity of piece-rate analysts, who were required to process 1,200 claims per week with an error rate of no more than 2% to maintain a quality work standard of 98%. According to Sumter, the AMOS system was not completely accurate. In May of 2008, BCBS increased the piece-rate production standard to a requirement of 1,875 claims per week. It also utilized a system to audit piece-rate employees, including Sumter in 2009, through which the defendant's quality control department would compile weekly individual claim processing reports and forward any errors to an employee's supervisor or manager. Sumter's supervisors during the course of 2008 to 2009 were Nikke Cooper and Renee Branham, both white females.

In May of 2008, Cooper and Branham required Sumter to work on-site for individual auditing of her performance. Sumter wrote an email to Cooper and Branham on September 27, 2008 questioning why another piece-rate worker, April Winburn, was not also required to work on-site. In February of 2009, Sumter was again required to work on-site by Cooper and Branham for failing to met a 98% quality standard for the final three months of 2008. Cooper also directly monitored Sumter's work during a process called "problem time." Sumter remained an in-house employee until May of 2009. Sumter alleges that she made verbal complaints of race discrimination to Branham and manager Angela Holladay in June and July of 2009 with regard to being brought in-house and being subjected to individual auditing and monitoring. Sumter also called the defendant's



compliance hotline in March of 2009 alleging that she was improperly trained to process certain claims and was unfairly subjected to individual audits and the requirement to work in-house by management. (Richards Supp. Decl. Ex. 2, ECF No. 69-3 at 2.) Sumter's hotline complaint further states that two other piece-rate employees, Lakesha Prioleau and Winburn, were also making errors but were not required to work in-house.

In 2009, BCBS began noticing discrepancies in the record keeping by piece-rate employees and essentially began auditing their reports. On or about November 17, 2009, BCBS was Sumter was confronted by Branham and Holladay with reports reflecting that Sumter had falsely logged time into My E-Time to inflate the number of claims actually worked. The defendant's records also indicated that Sumter had falsely reported working on several days in November of 2009. Sumter was locked out of her computer system and unable to continue to work after that meeting. On November 20, 2009, Sumter was called into another meeting where she denied intentionally falsifying data and discussed computer problems she had been having. Sumter remained on work suspension until her termination on December 3, 2009. Sumter's termination letter indicated that she was suspended for discrepancies between the work reported and the work actually completed and was being discharged based on reports and an investigation finding that she violated the defendants "Payroll" and "Our Values" policies. (Branham Dep. Ex. 2 at 1, ECF No. 57-4 at 1.) BCBS's investigation of piece-rate employees was completed by the end of January 2010. Cooper, Sumter's supervisor, was disciplined via written warning for violating the defendant's policies by failing to monitor, manage, and review for access the data submitted by her employees, including Sumter. On April 12, 2010, Sumter filed a charge of discrimination based on race. (ECF No. 1-1 at 1.) Sumter's

discrimination charge also alleged retaliation. (Id.)  After receiving a right-to-sue letter, Sumter filed this action.

## DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*."  Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks and citation omitted).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  Id. at 257.

In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor.  Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002).  The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The court must determine



whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B.      Burden Shifting Framework in Employment Cases**

A plaintiff may demonstrate discrimination through direct or circumstantial evidence. A plaintiff may produce circumstantial evidence and proceed under the McDonnell Douglas burden-shifting framework. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 520 (4th Cir. 2006); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. Merritt v. Old Dominion Freight, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." Reeves, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the McDonnell Douglas framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).



Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " <u>Merritt</u>, 601 F.3d at 294 (quoting <u>Burdine</u>, 450 U.S. at 256) (alterations in original); <u>see</u> <u>also</u> <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. <u>Burdine</u>, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." <u>Reeves</u>, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. <u>Id.</u> Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." <u>Id.</u> at 148-49. "Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination." <u>Merritt</u>, 601 F.3d at 294-95.

C.    **Sumter's Title VII Claims**

1.    **Disparate Treatment**

a.    **Discriminatory Discharge**

Sumter appears to raise a claim of disparate treatment based on her race stemming from her discharge. To establish a *prima facie* case for such a claim, a plaintiff must demonstrate that: (1) she is a member of the protected class; (2) her employment was terminated; (3) at the time of her termination, she was performing at a level that met the employer's legitimate expectations; and (4) her position remained open or was filled by a similarly qualified individual outside the protected class. See Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2006) (quoting Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 285 (4th Cir. 2004) (*en banc*)); see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

While it is undisputed that Sumter meets the first two elements of the *prima facie* test, the defendant argues that Sumter was discharged for her own misconduct and cannot demonstrate satisfactory job performance or fulfillment of the defendant's legitimate expectations at the time of discharge.[1] In analyzing this element to determine satisfactory job performance, a plaintiff's performance is evaluated at the time of the alleged adverse action and courts have recognized that it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff. King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003) (Title VII) (stating that plaintiff's own

---

[1] Because BCBS's proffered reason for Sumter's termination is that she was not meeting expectations, the evidence as to the *prima facie* issue and the pretext prong of the McDonnell Douglas framework overlaps; therefore, the court addresses these issues together. See Warch, 435 F.3d at 516 (noting the flexibility of the McDonnell Douglas framework and finding "no impermeable barrier that prevents the employer's use of such evidence [of an employee's performance] at different stages of the McDonnell Douglas framework").



testimony of satisfactory job performance cannot establish a genuine issue as to whether he was meeting his employer's expectations in a race discrimination case) (citing Evans, 80 F.3d at 960-61). An employer's expectations of its employees are considered "legitimate" when they are honestly held; whether the employee agrees with those expectations is not the test. Thornley v. Penton Pub., Inc., 104 F.3d 26, 30 (2d Cir. 1997) (stating that "a plaintiff must satisfy the employer's honestly-held expectations"). In this context, the term "legitimate" means that expectations cannot be a "sham designed to hide the employer's discriminatory purpose." Warch, 435 F.3d at 518. As long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers. Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1179 (7th Cir. 1997) (Posner, J.).

In support of its motion, BCBS presents evidence supporting its contention that Sumter was terminated for violating the defendant's personnel policies by inflating her production numbers and falsifying time and production records. While Sumter asserts that she was meeting performance goals at the time of discharge and denies intentional falsification of reports, she admits to possible negligence in failing to report the actual number of claims processed each day. (Pl.'s Opp'n to Def.'s Mot. Summ. J. at 17, ECF No. 63 at 17; Clyburn Decl. at 4, ECF No. 57-15 at 4.) Sumter also admitted to being out of town on November 6, 2009, when her production report reflected that she processed claims that day. The defendant's report reflects that Sumter did not log into the claims processing system on November 6, but Sumter indicated that she worked from her laptop computer and attributed the discrepancy to a failure of the defendant's computer system. However, Sumter did not report any computer system issues to the defendant's "help desk" and other employees who processed claims on that date had no issues with the computer system. Thus, viewed in the light



most favorable to Sumter, the evidence shows that she did not accurately report the number of claims she processed to the defendant. Therefore, Sumter cannot demonstrate that she was meeting the defendant's legitimate expectations at the time of discharge, or that its stated reason for her termination is false.

Moreover, nothing in the record suggests that the defendant did not genuinely believe that Sumter was falsifying time and production records at the time of her discharge. Instead, the record reflects that the defendant investigated suspected inflation of production numbers by "piece-rate" employees from November of 2009 until January of 2010, resulting in the decision to discharge ten such employees of various races, including Sumter. (Richards Decl. at 1, 4, ECF No. 57-10 at 1, 4; see also Richards Decl. Ex. 2, ECF Nos. 57-11, 57-12.) In fact, Sumter testified that she has no evidence to dispute the accuracy of the reports and data gathered during the defendant's investigation. (Pl.'s Dep. 87, ECF No. 57-17 at 87.) Thus, Sumter provides no evidence from which a reasonable jury could find that the defendant's reasons for terminating Sumter were a sham or that the defendant did not genuinely believe that Sumter failed to meet the company's legitimate expectations at the time of discharge. See Holland v. Washington Homes, Inc., 487 F.3d 208, 217-18 (4th Cir. 2007) (finding that no reasonable juror could conclude the decision maker's reason was pretextual where the plaintiff's evidence "failed to address whether [the decision maker] did not honestly believe that the threats were made"); see also Coco, 128 F.3d at 1179. Thus, the defendant's motion for summary judgment should be granted as to this claim.

b.    **In-House Work Requirement and Disparate Responses to Policy Violations**

Sumter also alleges that the defendant treated her differently from other similarly situated employees by requiring her to work in-house for periods of time and by imposing harsher discipline on Sumter than on other employees.

The elements of a *prima facie* case of discrimination based upon racially disparate treatment are:  (1) membership in a protected class; (2) adverse employment action; (3) satisfactory job performance; and (4) different treatment from similarly situated employees outside of the protected class.  See Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010) (citing White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004)).  Similarly, to establish a claim of disparate discipline, a plaintiff must show:  (1) that she engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin; and (2) that disciplinary measures enforced against her were more severe than those enforced against the other person.  Lightner v. City of Wilmington, 545 F.3d 260, 264-65 (4th Cir. 2008).  To prevail on either theory, Sumter must show that an employee outside the protected class who was similarly situated to her was treated more favorably.  See Coleman, 626 F.3d at 190 (requiring a plaintiff to demonstrate that other employees outside the protected class were treated differently); Lightner, 545 F.3d at 264-65 (requiring a plaintiff to show that she engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin).

To be similarly situated and thus permit a valid comparison, the employees outside the protected class must have dealt with the same decision maker, been subject to the same standards, and engaged in the same conduct without mitigating circumstances that would distinguish their



conduct or the employer's treatment of them for it.  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (Title VII & ADEA) (defining "similarly situated");[2] see also McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001) (emphasizing that an employee must be similarly situated in all material respects); Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010) (stating that "plaintiffs are required to show that they are similar in all relevant respects to their comparator").

In regard to Sumter's periods of in-house work, the undisputed record demonstrates that the defendant imposed this requirement because Sumter failed to meet the 98% quality standard.  Sumter asserts that the defendant did not require two other piece-rate employees with low quality standard scores, Winburn and Prioleau, to work in-house.  (Pl.'s Dep. 116-17, ECF No. 57-17 at 116-17.) However, the record reflects that Prioleau is also an African American female—therefore not outside Sumter's protected class.  Winburn is identified as a white female who had similar performance numbers, held the same job as Sumter, and worked for the same supervisors.  However, the undisputed evidence shows that the defendant attempted to bring Winburn in-house in 2009, but Winburn elected to quit her job rather work on site.  (Branham Dep. 51-52, ECF No. 57-3 at 51-52; Cooper Dep. 35-36, ECF No. 57-6 at 35-36.)   Thus, to the extent Sumter's in-house work requirement can be deemed an adverse employment action, she cannot show that Winburn was treated differently.

---

[2] The Fourth Circuit has not issued a published case on this point; however, the following unpublished cases have cited with approval the Mitchell decision:  Atkins v. Holder, 529 F. App'x 318, 321 (4th Cir. 2013); Forrest v. Transit Mgmt. of Charlotte, Inc., 245 F. App'x 255 (4th Cir. 2007); Heyward v. Monroe, No. 97-2430, 1998 WL 841494, at *2 (4th Cir. Dec. 7, 1998); Edwards v. Newport News Shipbuilding & Dry Dock Co., No. 98-1338, 1998 WL 841567, at *3 (4th Cir. Dec. 7, 1998).

Sumter also asserts that Cooper was written up based on the same policy violations which resulted in Sumter's discharge, but disciplined less severely.  The undisputed evidence shows that Cooper was Sumter's supervisor and that the two had different job titles and duties.  (Pl.'s Dep. 182, ECF No. 57-17 at 182.)  Further, the evidence reflects that Sumter was discharged for falsifying compensation reports to show inflated production numbers while Cooper, as her supervisor, was verbally counseled for failing to monitor, manage, and review the accuracy of all data reported by her employees.  (See Cooper Corrective Action Report, ECF No. 63-9 at 2.)  As the two employees held different positions and were sanctioned for different types of policy violations, Cooper is not a viable comparator for Title VII purposes.  See Mitchell, 964 F.2d at 583 (indicating that to be similarly situated the comparators "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"); see also Lightner, 545 F.3d at 265 (finding that a proffered female police officer comparator was not sufficiently similarly situated to the plaintiff because she was not a division commander or even in the same division as the plaintiff); Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2004) ("Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees."), cited in Brown v. Dir. SCDC, C/A No. 8:08-3761-HFF-BHH, 2010 WL 3167331 (D.S.C. Aug. 5, 2010) (Floyd, J.).  Because Sumter cannot establish that Cooper received different treatment by the defendant, or that Sumter and Cooper were materially similar and engaged in the same conduct without mitigating circumstances, the defendant's motion for summary judgment should be granted as to these claims.

PJG

2.     **Retaliation**

Claims of retaliation are also analyzed under the McDonnel Douglas burden-shifting framework.  See Yashenko v. Harrah's NC Casino, Co., LLC, 446 F.3d 541, 550-51 (4th Cir. 2006). Title VII makes it unlawful for an employer to retaliate against an employee for engaging in activity protected by the statute.  See 42 U.S.C. § 2000e-3(a).  In a typical retaliation case, a plaintiff must show that:  "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland, 487 F.3d at 218.  Further, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

The defendant argues that Sumter cannot show that she engaged in a protected activity or that sufficient temporal proximity exists to establish the requisite causation.

"Protected activity" under the statute falls into one of two categories:  opposition or participation. Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271 (2009); Peters v. Jenney, 327 F.3d 307, 320 (4th Cir. 2003) (stating that to establish that a plaintiff engaged in protected opposition activity, she must show that she opposed an unlawful employment practice which she reasonably believed had occurred or was occurring).  To constitute protected activity, a plaintiff must have conveyed to the employer a reasonable belief that the actions complained of violated federal law. Jordan v. Alternative Res. Corp., 458 F.3d 332, 340-41 (4th Cir. 2006) (stating that "an employee seeking protection from retaliation must have an objectively reasonable belief in

light of all the circumstances that a Title VII violation has happened or is in progress") (citing Equal

Employment Comm'n v. Navy Federal Credit Union, 424 F.3d 397 (4th Cir. 2005)).

To prove a causal connection, a plaintiff asserting a retaliation claim must be able to show

that her employer took the adverse action " '*because* the plaintiff engaged in a protected activity.' "

Holland, 487 F.3d at 218 (emphasis in original) (quoting Dowe v. Total Action Against Poverty in

Roanoake Valley, 145 F.3d 653, 657 (4th Cir. 1998)).  Thus, to demonstrate causation, a plaintiff

must show that the employer was aware of the protected activity.  See Shield v. Fed. Express Corp.,

120 F. App'x 956, 962 (4th Cir. 2005) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th

Cir. 2004)).  In certain circumstances, temporal proximity between the protected activity and the

adverse action can be probative of a causal connection.  See Clark Cnty. Sch. Dist. v. Breeden, 532

U.S. 268, 273-74 (2001) (noting that to establish a causal connection based on temporal proximity

alone, the time between the employer's knowledge of the protected activity and the adverse

employment action must be "very close" and holding a twenty-month period to be insufficient).

In this case, Sumter alleges that she complained of discriminatory treatment in a September

2008 email and was required to work in-house five months later in February of 2009.[3]  Sumter also

alleges that called the defendant's hotline in March of 2009 and made direct verbal claims of race

discrimination to a manager and director in July 2009.  However, even assuming that Sumter

engaged in protected activity, she has offered no evidence from which a reasonable jury could find

that her termination in November of 2009 was causally connected to the September 2008 email,

---

[3]  As indicated above, the defendant presented evidence that Sumter's requirement to work in-house in February of 2009 resulted from her insufficient quality standard scores from October 2008 until December 2008.  (Branham Dep. 47-49, ECF No. 57-3 at 47-49; Cooper Dep. 34-35, ECF No. 57-6 at 34-35.)



March 2009 hotline call, or the July 2009 verbal complaint. See Breeden, 532 U.S. 273-74; Pascual v. Lowe's Home Centers, Inc., 193 F. App'x 229 (4th Cir. 2006) (*per curiam*) (holding that the plaintiff had failed to establish a causal connection by temporal proximity alone when "at least three to four months" separated the claimed protected activities and the termination of the plaintiff's employment). Further, the defendant presents abundant evidence that Sumter's discharge was based on her falsification of production records, and while Sumter takes issue with the characterization that they were falsified, she does not dispute that her entries were not accurate and that many others whose entries were also inaccurate were also fired. As such, Sumter cannot show a reasonable jury that she would not have been fired "but for" her alleged complaints of discriminatory treatment. See Holland, 487 F.3d at 218. Moreover, she has presented insufficient evidence to show that these proffered reasons were false or were otherwise a pretext for retaliation. See Merritt, 601 F.3d at 294. Therefore, the defendant's motion for summary judgment should be granted as to this claim.[4]

### 3.     Hostile Work Environment

Sumter also alleges that she was subjected to a hostile work environment based on her race. Title VII prohibits creating or allowing a hostile work environment based on race, color, religion, sex, or national origin. See Baqir v. Principi, 434 F.3d 733, 746 n.14 (4th Cir. 2006). Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)

---

[4] Sumter's retaliation claim associated with the February 2009 "in-house" work requirement and March 2009 hotline complaint also appear to be time-barred because she failed to file her charge of discrimination until April of 2010, more than 300 days after the alleged occurrence of these discrete acts of retaliation. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).



(internal quotation marks and citations omitted) (Title VII). However, "[w]orkplaces are not always harmonious locales." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (Title VII). Moreover, federal employment statutes are not "general civility code[s]." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (Title VII).

To make out a hostile work environment claim under federal anti-discrimination laws, a plaintiff must show that (1) she experienced unwelcome harassment; (2) the harassment was based on a protected characteristic; (3) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. Baqir, 434 F.3d at 745-46; see also Pueschel v. Peters, 577 F.3d 558, 564-65 (4th Cir. 2009).

To meet the second element, a plaintiff must show that "but for" one of these protected traits, she would not have been a victim of harassment. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a protected characteristic. See Graham v. Prince George's Cnty., 191 F. App'x 202, 204 (4th Cir. 2006) (finding the district court did not err in determining that "although [the] facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic"); see also Oncale, 523 U.S. at 80; Shirer v. Tri-County Elec. Co-op, Inc., C/A No. 5:07-1156-MBS, 2009 WL 2900767, at *8 (D.S.C. Sept. 9, 2009).

Moreover, in a hostile work environment case, the behavior must rise to the standard of being so "severe" or "pervasive" so as to create an abusive working environment. Harris, 510 U.S. at 21; see also Baqir, 434 F.3d at 746. When analyzing this element, courts examine the totality of the

Page 16 of 20



circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance. <u>See</u> <u>Harris</u>, 510 U.S. at 23; <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745, 753 (4th Cir. 1996); <u>see</u> <u>also</u> <u>Sunbelt Rentals, Inc.</u>, 521 F.3d at 315-16 (stating that complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

Sumter alleges that at various times between May of 2008 and December of 2009 she was required to work on site, subjected to individual audits, and intensely supervised. However, even if true, such allegations are insufficient to show that Sumter's workplace was permeated with discriminatory intimidation, ridicule and insult that were sufficiently severe or pervasive to create an abusive working environment. <u>See Harris</u>, 510 U.S. at 23. Notably, none of the actions she complains of bears any connection to race. Moreover, as discussed above, Sumter offers no evidence refuting the defendant's showing that her in-house work periods and increased supervision resulted from her deficient quality standard scores. Thus, even if Sumter could establish that she meets the *prima facie* test for a hostile work environment, she cannot show that "but for" her race she would not have been the victim of the alleged harassment. <u>Causey</u>, 162 F.3d at 801.

**D.    State Law Claims**

**1.    Defamation**

Sumter alleges that the defendant committed slander by "allowing Cooper to state to Team Leader Tonya Huff that Ms. Sumter falsified her pay records." (Pl.'s Opp'n Summ J. Mot. at 33,



ECF No. 63 at 33.)  "To prove defamation, a plaintiff must show (1) a false and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Banks v. St. Matthew Baptist Church, 750 S.E.2d 605, 607 (S.C. 2013) (internal quotation marks and citation omitted).  As argued by the defendant, Sumter provides no admissible evidence of defamation in this case.  While Sumter alleges that Cooper communicated an allegedly false and defamatory statement about Sumter to Huff, Sumter did not hear Cooper make such a statement, Cooper has denied making it, and Huff has not testified in this case.  (Pl.' Dep. 141-44, ECF No. 57-17 at 141-44; Cooper Dep. 65, ECF No. 57-6 at 65.)  As Sumter provides no evidence other than her own speculation that Cooper made a defamatory statement to Huff, the defendant's motion for summary judgment should be granted as to Sumter's defamation claim.  See Othentec Ltd. V. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) ("The non-moving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.' ") (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

### 2.    Wage Payment Claim

Sumter alleges that the defendant did not pay her for work performed between November 9, 2009 and November 17, 2009.  The South Carolina Wage Payment Act ("SCWPA") "prohibits employers from unilaterally withholding an employee's wages unless the employer has given written notification to the employee of the amount and terms of the deductions." Visco v. Aiken Cnty., S.C., 974 F. Supp. 2d 908, 920 (D.S.C. 2013) (citing S.C. Code Ann. § 41-10-80(C)).  The defendant presented evidence that Sumter's paycheck dated November 20, 2009, which she cashed, covered the payroll period ending on November 15, 2009.  (Richards Decl. at 3, ECF No. 57-10 at 3.)

Sumter has not presented evidence to refute the defendant's showing or presented evidence to establish that she performed any work requiring compensation after November 15, 2000.[5] Therefore, the defendant's motion for summary judgment should be granted as to Sumter's SCWPA claim.

## RECOMMENDATION

Based on the foregoing, the court recommends that the defendant's motion for summary judgment be granted (ECF No. 57).

_____
Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

August 12, 2014
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

---

[5] In fact, Sumter testified that sometime in 2012 she destroyed the calendar on which she recorded her time. (Pl.'s Dep. 45, ECF No. 57-17 at 45.)

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' "  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).